Good morning. May it please the Court, Kimberly K. Tucker for Appellant Anthony J. Truitt. I am going to reserve two minutes for rebuttal. Now, there are several issues as raised in the brief in this case, but today I'd like to focus on the lay testimony. I think that's extremely important in this case. There were two separate types of lay witness testimony. We had the statement of the employer, Richard Wheel, and we had his wife's testimony at the hearing. And the ALJ actually did address this testimony in his decision, but I would argue that his rejection of that testimony was cursory. He said, basically, I credit it, but I don't credit it to the extent that Mr. Truitt is disabled. However, those lay witnesses did raise several or provide several observations of limitations that exceed what the ALJ credited in his residual functional capacity assessment. For instance, his wife pointed out that he couldn't even take a phone message, a routine phone message at home, suggesting some pretty severe concentration issues. And Mr. Wheel noted that Mr. Truitt couldn't even perform simple filing tasks at the level that, I believe, he said a high schooler could do it. And those are some pretty notable, pretty severe limitations just on the mental side. More importantly, these witnesses, admittedly, Mrs. Truitt obviously could be said to have a stake in this, as she is married to Mr. Truitt, would presumably benefit from him getting Social Security benefits. But Mr. Wheel is a reporter. Now, in my experience as a plaintiff's attorney and also other attorneys I've spoken with, it is unusual for an employer to step up like this and actually submit a statement in a Social Security hearing. You know, whether it's fear of litigation, whatever, they're not usually willing to step forward and speak on their client's behalf. Not only did Mr. Wheel do this, he did this very, very strongly. And when you read the testimony of Mrs. Truitt and you read the statement of Richard Wheel, it really backs up not only what the plaintiff, what the appellant had testified to in the hearing, but also what is laid out in the medical opinions, particularly Drs. Beam and Putnam. I'm sorry? Putman? Putman, the psychiatrist or psychologist. Sorry. And it's also important that both of these lay witnesses had the opportunity to observe Mr. Truitt extensively in completely different environments, one in the home environment and one in the work environment. Neither one gave any indication that they ever believed Mr. Truitt to be malingering. And I think that's particularly notable on the part of Mr. Wheel as an employer. And as I said previously, the lay witness evidence really does support what both Drs. Beam and Putman say. Where in the record do you know offhand is the ALJ's discretionary testimony? It is. One moment and I will find out for you. It would be Section 2 of the Plaintiff's Excerpt of Record. And he discusses the, let's see, he discusses the wife's testimony at page 7. Right, but where did he evaluate it? I'm sorry? Where did he evaluate it? That is what I'm looking for. Okay, okay. It's on page 8 as well. Okay. Thank you, Your Honor. Counsel, what are we supposed to do with the fact that Mr. Truitt has a college degree and compare that with the idea that he can't take phone messages and he can't file? Well, I think that it does strike one as unusual given his allegations on the face of it. However, if you look at his testimony, you see that he didn't just go in and study as a normal person would. He couldn't even take notes in class because he would get so distracted. He might make one mistake in his notes and he would get distracted and miss everything thereafter. So what he had to do was tape record his notes, Your Honor, and then he spent an average of seven hours every night transcribing those notes. Shows a lot of diligence and a lot of attention to detail. It does, and yet when he went to try and use his degree, I believe it was his paralegal degree, he couldn't do it. He simply couldn't apply what he had learned. The ALJ did conclude that Marcia Truitt and Richard Mill are not fully credible to the extent of claims to say before work activity, and that's inadequate because it's not specific enough? Is that basically your argument? I'm sorry? Is your basic argument that there is an express finding of college credibility, but it isn't explained? Right. And is that basically your argument? That is, Your Honor. I would argue that under the... Is it? I'm sorry? The explanation is basically that it's inconsistent. The ALJ says those conclusions that they express are inconsistent with the remainder of the record, particularly the medical testimony, and also it's inconsistent because it's based to some extent on what Mr. Truitt says and that he is somebody who exaggerates. Right. I believe it was Jodrell v. Shalala where the court found that basing it on lack of plaintiff's credibility is not a sufficient reason, is not a reason to remain to the witness to reject the testimony. And I would argue that just generally saying or generally implying that something is inconsistent, again, is not meeting the legal standard, which is you must provide a reason germane to these witnesses to reject their testimony. Credibility finding a jury or anybody else. If you have two people who are saying inconsistent things, you have to believe one of them. And the statement that I've chosen to believe one, there is a constant in the evidence, and I've chosen to believe X over Y, is it... Sure. It's different when you don't have any conflicting evidence, but when you do have conflicting evidence... Well, I would point out, Your Honor, that these two statements are remarkably consistent with each other, and there's no indication that they ever spoke with each other. And this is also in light of the fact that they're talking about two completely separate things. One is talking about work functioning. One is talking about outside of work functioning. And I think that that deserves, you know, due credit. You wanted to save two minutes. You have just over two minutes. Okay. I believe I will conclude at this time, Your Honor. Thank you. May it please the Court. Good morning. My name is Joanne D'Antonio. I'm here appearing on behalf of the Commissioner of Social Security in this case. There are two issues I want to address today, one which is kind of an overpowering issue in this case, which is the claimant's credibility, which permeates throughout the record and is relevant to all the other evaluation of the rest of the evidence, and also the lay witness and supposing counsel has raised that issue. The credibility evaluation is key in this case. It leads to the ALJ's conclusions and helps his evaluation of what we do have is conflicting evidence. The ALJ gave several reasons, based on all the evidence, to find that Mr. Truitt's complaints of disability based both on back pain and mental impairments were not entirely credible. And he set out several reasons for that. There's no question that Mr. Truitt does have and has been diagnosed with some conditions, low back pain and some mental impairments, that do cause some limitations. But the ALJ determined that his complaints were excessive and were not entirely credible. And one reason he gave was that they were inconsistent with the medical evidence. Mr. Truitt in this case has not cited any error to the ALJ's decision or the argument. The medical evidence is that he had, as I understand the medical evidence situation, if there is some medical evidence of an objective condition that could give rise to this objective perception of pain, then that's enough with regards to the medical evidence. And this gentleman was on all manner of pain medication, as I understand it. So it wasn't as if he wasn't actively and vigorously seeking relief from pain. There's also a great deal of testimony about things he did both on his job and in doing his activities to compensate for the pain situation. So what do you mean when you say the medical evidence is insufficient? Well, medical evidence, we're told by Morgan that medical, which is 169F3D at 599 to 600, that medical evidence is a relevant credibility criteria. But what we're told by Rawlins is that it cannot be the sole factor in determining credibility or discounting the claimant's claims of pain. But as two main doctors, certainly Beeman and Ms. DeVisser certainly understood that he had serious pain issues. They did. But the ALJ also looked at their opinions and their treatment records, and there are times throughout Ms. DeVisser's records where it shows he has requested pain medication and she has denied it because her observation, her objective observation of him was that he was not in the amount of pain that he indicated he was. Basically, she looked at how he was taking pain medication. He was. Correct. And there's nothing to say that you can't be taking pain medication or that you're not having some level of pain. The question is, was he having the level of pain to the point where he could essentially do nothing or that he was restricted to sedentary activities? The ALJ doesn't have to believe everything that the claimant says. If the claimant has a minor, let's say, mechanical injury, muscular only, with no other radiculopathy or any other bulging discs or other objective findings of some severe impairments, he is allowed to find that the claimant's testimony of this excruciating pain is inconsistent, and he must be exaggerating. If the ALJ had to basically buy off on everything that the claimant said to the point of their excessive pain, then there would be no reason to do any evaluation of credibility or any evaluation of the medical records. You began by saying that the medical evidence was inconsistent, and that's really what I was asking. Not whether he could have disbelieved the claimant, but whether the medical evidence is inconsistent with the claimant, because it doesn't seem to be in there. I'm sorry, I'm having a hard time hearing. The medical evidence is inconsistent with the claimant. That was your point. It wasn't whether he could disbelieve the claimant. Correct. And are you asking what medical... You're saying that those seem to me to be two different points, and you're now arguing the second more than the first. You began by saying the medical evidence was inconsistent with the claimant's pain reports, and that's what I'm questioning. Correct, and that is an appropriate credibility issue. That is an appropriate factor for the ALJ to look at in determining his credibility. Are his complaints of pain excessive, or are they reasonable based on what the medical evidence shows us? And the medical evidence consists more than just Dr. Beam's opinions, stating that he's disabled from all work. There is also the findings of Dr. Ogisu in August of 2000. His reports are found at the supplemental excerpts of records from 138 to 140. He reviewed the objective evidence, such as an MRI from 1999, that showed that he only had minimal degenerative disc disease and nothing further. He found that plaintiff's complaints were far in excess of what the objective evidence showed. Dr. Ogisu also noted that when the claimant wasn't paying attention or didn't think he was being watched, his complaints of pain were completely inconsistent with the manner in which he moved. Dr. Ogisu noted- Was there more than the fact that he looked out the window and saw the patient getting into his automobile? Is that what you mean by- I'm sorry. I believe there was a point where he indicated that when the claimant was distracted, and I believe that's 139 to 140, when the claimant was distracted or not focused on responding to a question or having to answer if there was pain, that his symptoms seemed to be less. There was also a CT scan in August of 1998 that showed that he had no change in his condition from 1991, and in this case he claims an onset of disability at a much later time, and that there were just minimal findings. Also, Nurse DeVisser, as I explained before, denied a request for an injection in 2001 because she noted he showed no signs of discomfort. Throughout her record, at 87, 89, 107, and 110, basically she's not finding that he's as limited as he says he is. He's able to move around freely. Someone with the amount of pain that he has wouldn't be able to sit up, stand up, move from different positions within the examining room as he did. There were many other reasons. He looked at potential drug-seeking behavior. This is an interesting issue in this case because we've had the additional evidence that's been submitted. Basically, I would say at this point that based on the information available to the ALJ at the time, there was multiple reasons why the ALJ believed that there was some drug-seeking behavior, and the Edlund case tells us that that is a relevant credibility factor. If Ms. DeVisser's subsequent statement, which suggests that the ALJ misunderstood her view about whether he was drug-seeking, would that be a basis for remanding it to consider that? No, Your Honor, and the reason for that is because it's completely inappropriate to be before the court at this point in time. There's been no request for supplementation of the record. This is not a typical supplementation of the record. This is addition of more evidence that's outside the record. Well, it couldn't have been before. It couldn't have been in the record originally because Ms. DeVisser would not have known about what the ALJ would think until she read the report, and by then the record was closed. So the question is, would this be a proper basis for supplementing the record and remanding it? If the decision is based on a misunderstanding, in part on a misunderstanding of Dr. DeVisser, Ms. DeVisser, whatever it is. Well, I think not at this point for the reasons that I indicated before, and also because this was not the ALJ. Well, I'm not sure what those reasons are because it's not a proper motion, is that right? There's actually not been a proper motion. There's not been a showing that this is new and material, that this information did not exist. I mean, the medical records. Do you have an answer to that? How it could have existed at the time? Well, the medical records existed at the time. She was giving treatment at the time. Obviously, at the ALJ's hearing, he made it very clear that he felt that there was an issue with drug-seeking behavior, and he talked about Dr. Beam and Nurse DeVisser and his concerns with that. So counsel and plaintiff were on notice that this was an issue. Also, at the district court level, plaintiff could have requested a supplement. I mean, we have a process where if this evidence was submitted to us, we find it, or if we believe that it's new and material, we can request that this be remanded for further proceedings. I guess my second reason why I believe that this shouldn't be done is that this is not the only reason. This was one reason why, how he made his credibility determination. It pertains to drug-seeking behavior anyway. Well, Edlin tells us that it's appropriate to consider because someone may exaggerate their symptoms in order to gain pain medications. Or it may be that they are seeking the drugs because they are in bad pain, and they want more than to be prescribed for them, and they think they're not getting enough. And that's possible, but it is one factor that the ALJ is allowed to consider. And as I said, it's only one factor. It doesn't sound to me as at all logically pertinent. The Edlin case tells us that this is a reason to look at this. I mean, this is not the only reason. Another reason was that he had seen Dr. Beam shortly before in order to get benefits. Well, that happens all the time. That can't be a reason. The fact that he went to his doctor to get a report for the hearing can't be a reason. I would partially concede on that. The reason for the reports is correct. The agency does concede on that. Essentially what I believe the ALJ was trying to get across is that when Mr. Truitt went into the office, it was obvious that he told the doctor, I've got a disability hearing coming up. So I think that's what he was looking at. You need to get a report from your doctor if you're going to have a photo disability. Well, I guess the concern there was that there may have been some exaggeration, knowing that this was the report, the last report that was considered. So what we have is one and a half or two reasons of the ones that were given not being worth a lot. Well, I disagree about the pain medication and the Edlin decision, so I guess we'll have to agree to disagree on that one. But I think the case law does tell us that that is a legitimate reason. And he also looked at, as far as his credibility regarding ADHD, as Your Honor noted that it is, everyone has noted, that it is incredibly inconsistent to consider yourself illiterate and obtain not only a paralegal degree but a BA degree, a college degree. Well, it is a bizarre case in that respect. On the other hand, when he does go and get a job, he tries to get one that's a paralegal. He can't do it. But this employer who's very sympathetic to him then gives him a job as a file clerk, which is also rather odd for somebody with a college degree who says he got the degree because he wanted to go to law school. So it's a very strange set of circumstances. It is. He also said that he couldn't, he didn't know the alphabet, and somebody tested him and he didn't know the alphabet. Well, I think it shows two different things. One, he admitted when his own attorney asked him if he had conned and manipulated his way, if that's what he had done, and he admitted it. That's a pretty strong statement, and I think it goes pretty heavily. But even those people can get back disorders. I'm sorry? Almost everybody gets them. I said even people who con their way through college can get a back disorder. Well, I think what he was looking at with that was he was looking at the claims of ADHD and his mental limitations compared to that. But as you noted, he very diligently for seven hours in the evening was able to sustain some concentration at least to be able to transcribe those notes. And he got a college degree. In nine months, supposedly. In nine months. But he got a paralegal degree. That was two years. So on one hand, we've got obviously he's conning and manipulating his way, and he's manipulating something. So why should we not believe that the conning and manipulating hasn't kind of pervaded throughout? And I think Dr. Ogisu's report is pretty illustrative of that. I just reread that report, and he does describe the parking lot incident that I mentioned. Other than that, I don't quite understand it. It's in his impressions. He says he's extremely focused on his pain, which probably explains the fact that he has noted reduced pain levels when distracted. I'm not quite sure what that leads you to, that somebody who's in pain can be distracted from that pain. Well, if they're not truly in the level of pain that they are saying they are. Even if you are in a level of pain, can't you be distracted from that pain by something temporarily? I don't have the answer to that. I don't know the answer to that. I mean, you know, I have seen reports where the doctor says, I think he's malingering. This isn't that strong a report. I think he comes close, but you're right. It's not that strong. But this is a non-treating doctor. Correct. Correct it is. And two treating doctors basically said other ones. Now, DeVisa does say that at some points that his pain wasn't bad enough to get the most extreme pain medication, but she was treating him seriously for pain all the way through. She was. But she doesn't particularly make a disability opinion. I mean, there are several places where she indicates, in her observations of him, he is able to move freely about. But his testimony is that he just cannot even do minimal things, that he can't sit for very long, he can't stand for very long. And it's just inconsistent with her observations of him over the period of time. And you can have a level of pain, but whether or not it's to the point of disabling pain, that's what the ALJ had to decide. The other issue with the, and I forgot where I was, with the lay witnesses and the statements, was that the ALJ considered that and adopted that into his RFC. Essentially, plaintiff has argued that he had difficulties in concentration. And the state agency physicians found that he did often have concentration, persistence, and pace problems. The Thomas case tells us that that means you do simple, routine, repetitive work. And that was what the RFC was. Based on that RFC and the vocational hypothetical, with those limitations, they found that he was able to do other jobs. And I am more than out of time, unless you had any other questions. What's a little puzzling is that even if you take the state's view, that all he can do are these sort of mechanical, non-repetitive, repetitive jobs, don't require concentration. Even if you take that, it makes it inexplicable that he got through college and got the paralegal's degree. Even under the state's theory. And I don't know how to explain that. Other than, obviously, he has a little more diligence. I don't know how to explain that. And that happened in 1992, which may be a factor that maybe I shouldn't point out, because it is much more before his onset. But the theme of conning and manipulating his way through seems to permeate. And I cannot tell you how to resolve that. It's a question that the ALJ really struggled with. It's the question that the psychologists who examined him just couldn't seem to understand. It just shows that he has, as he has stated, when he sets a goal, he's able to do it. So in this case, his goal was in order to obtain disability benefits. At the time that it was in his best interest, he was able to do some things. When it was not, he was not able to do things. All right. Thank you, Kathy. Thank you. Thank you. First of all, as I was sitting here, I realized, having, of course, gone to college myself, a typical college student takes, what, maybe two, three classes in a day, which equates to two, three, maybe four hours of sitting in class. And yet it took him seven hours every night to transcribe his notes. Once again, that is actually consistent with his concentration and attentional difficulties that it's taking him that long. How do you transcribe your notes if you don't know the alphabet? That is a tough question, Your Honor. It seems sometimes he does and sometimes he doesn't. I think he has. My understanding of not knowing the alphabet was he didn't know the order of the letters. Right. And that seems to come out in his filing job. He couldn't seem to file correctly as someone who understood the alphabet easily did. But if you're transcribing notes, you do have to know in which order you wrote the words down in the first place. Indeed. Either that or you have to have some kind of a key in order to understand how you wrote things down. I agree. And I don't have a good answer for that except to say, of course, we didn't get to see his notes. We don't know what his grades were actually like. Is this an accredited school he has a BA from? I believe it is an accredited school, yes, but I believe it's not a traditional bachelor's degree. It's one of those adult education type bachelor's degrees. I think it was George Fox. Anyway, and third, even though he was able to sit down and transcribe his notes, that speaks to his drive and his motivation to try and actually accomplish something. And yet he hasn't. He has not been able to apply either degree that he's earned. He has not been able to realize his vocational goals, and he did definitely have vocational goals. He wasn't even able to keep his job as a file clerk when he had originally hired on to be a paralegal. He was not. As I understand it, he wasn't let go as a file clerk. He left. Isn't that right? I believe he did leave, but he had missed significant time from the job due to his back pain, and he was having notable difficulties with the most simple of tasks, filing and, you know, taking messages. He was up with an incredibly sympathetic employer who was apparently willing to let him stay. That was a very sympathetic employer, and I think it speaks to the, you know, the good nature of that employer. But I think, you know, the employers also – sorry, I completely forgot where I was going with that. I think one of the answers the vocational expert gave was that if he would be absent two days a month, he would be disqualified from working or unable to work. Yes, Your Honor. How do we know whether somebody with this degree of pain would be absent two days a month? Well, I think that – I mean, that's a difficult one because there is no surefire way to – you know, there's no formula for that. There's – you know, you can't point to the pain and say, oh, this pain reaches X on the scale. But there are two ways. I think you have to look at the lay evidence, certainly, and the statement from Mr. Wills seems to indicate that that would be the case. And also, if there isn't anything else in the record that speaks to it, that would be an excellent time to bring in a medical expert to say whether that was medically reasonable and likely in this case. I mean, there was no evidence either way about whether – nobody came in and said, well, with this level of pain, he would have to be off two, three, five days a month. Right. The only thing you have in the record that I can see that relates to that was his previous employment. Right. And I think that's very strong evidence, Your Honor, just because it does come from the actual work environment instead of speculation about what might happen. All right. All right. Well, I'm over time, so I will wrap up now. Thank you very much for your time. Thank you, Cassie. The case just argued will be submitted. The next case for argument is Khrushchev versus Barnhart. Thank you.
judges: Reinhardt, Berzon, Bybee